**Sheree A. LOLOS, Plaintiff,**

v.

**SOLUTIA, INC., Defendant.**

**No. Civ.A. 99–30222–KPN.**

United States District Court, D. Massachusetts.

March 26, 2002.

A.J. O'Donald, III, Holyoke, MA, for Plaintiff.

Jay M. Presser, Rosemary J. Nevins, Skoler, Abbott & Presser, Springfield, MA, for Defendant.

---

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 31)*

NEIMAN, United States Magistrate Judge.

Sheree Lolos ("Plaintiff") alleges in this action that her firing by Solutia, Inc. ("Defendant") amounts to handicap discrimination in violation of § 4(16) of Mass.Gen.L. ch. 151B ("chapter 151B"). The parties have consented to the jurisdiction of this court, *see* 28 U.S.C. § 636(c), and Defendant has moved for summary judgment. For the reasons that follow, the court will allow Defendant's motion. In essence, the court concludes that chapter 151B—unlike the Americans with Disabilities Act ("ADA"), which Plaintiff has not invoked—does not accord Plaintiff the right to the accommodation she seeks, reassignment to a vacant position.

## I. *FACTUAL BACKGROUND*

For purposes of Defendant's motion, the parties do not dispute the following facts, sketched in a light most favorable to Plaintiff, the party opposing summary judgment. *See Sullivan v. Raytheon Co.*, 262 F.3d 41, 46 (1st Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 931, 151 L.Ed.2d 893 (2002). Defendant is an out-of state chemical corporation. In December of 1994, Plaintiff was hired at Defendant's Springfield facility as a Saflex Extrusion Operator ("SEO"), a physically demanding position which requires heavy lifting. Her last day of active work was May 8, 1995, when she suffered a work-related injury that resulted in carpel tunnel syndrome and tendinitis of the upper extremities ("CTS-tendinitis"). About one week later, Plaintiff was involved in a car accident.

In the Fall of 1995, Plaintiff received negative evaluations from a variety of physicians, including a neurologist. Consequently, on November 20, 1995, she filed a claim with the Massachusetts Department of Industrial Accidents ("DIA") seeking workers compensation benefits. On April 4, 1996, a medical examiner appointed by the DIA opined that, while Plaintiff was physically able to return to the plant, she could only perform "light" tasks in temperatures at least fifty-five degrees Fahrenheit and that she should not be assigned "the heavy work she used to do as an [SEO]." (Docket No. 36 ("Def.'s Exhibits, Vol. II"), Exhibit E–10 at 3.) At an October 9, 1996 hearing, evidence was presented to a DIA administrative judge that Plaintiff's SEO job involved "movement of materials using both arms, with regular lifting, pushing, pulling and reaching above the shoulder," which Plaintiff could not do. (*Id.*, Exhibit E–11 at 3, 5.)

On December 5, 1996, the administrative judge determined that, not only was Plaintiff "totally disabled" from May 8, 1995, through September 1, 1995, she should "be excluded from her usual work as an [SEO]." (*Id.* at 5–6.) The administrative judge also found, however, that Plaintiff had skills that would allow her to obtain other gainful employment in the job market, earning as least as much as she was with Defendant as an SEO. On March 12, 1998, the DIA review board remanded the earnings finding.

In the meantime, Plaintiff filed a second workers compensation claim in which she alleged that her condition had worsened. In June of 1998, the DIA-appointed medical examiner re-evaluated Plaintiff and confirmed her "total" disability with respect to the type of "heavy lifting" she was doing as an SEO. (See *id.*, Exhibit E–1 2 at 4.) At a September 25, 1998 hearing, Plaintiff testified that she was physically unable to return to work as an SEO. Soon thereafter, on December 7, 1998, the ad-

ministrative judge issued an opinion in which he reiterated that Plaintiff could not return to her former job (although he felt she could do light work) and concluded that she was entitled to partial disability benefits from September 1, 1995 forward. (See *id.* at 1–7.) The next day, Defendant terminated Plaintiff's employment.

In the midst of these benchmarks, Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits, which application was denied by the Social Security Administration ("SSA") on November 24, 1995. (The alleged reason Plaintiff sought SSDI benefits is addressed below.) An administrative hearing was held on September 16, 1996, at which a vocational expert testified that, given Plaintiff's restrictions, there were no jobs to which she could make a vocational adjustment. On September 27, 1996, an SSA administrative law judge found Plaintiff disabled for SSDI purposes.

Over two years later, in 1998, Plaintiff filed a report of continuing disability with the SSA in which she stated that she felt unable to return to work. Then, in January of 2001, Plaintiff testified at a reconsideration hearing that she was "disabled" and "unable to work." (See *id.*, Exhibit E–19 at 4.) The hearing officer found Plaintiff credible and concluded that her SSDI benefits should continue.

## II. *PROCEDURAL BACKGROUND*

In September of 1999, Plaintiff filed this action, at the time consisting of three counts, in state court. Defendant removed the complaint to federal court and then sought dismissal, arguing that each count—the chapter 151B count and two counts based on the state workers compensation act—was preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 et seq.

On October 20, 2000, Senior Judge Frank H. Freedman dismissed the workers compensation counts on the basis of preemption. He concluded, however, that section 301 did not preempt Plaintiff's chapter 151B count as that claim, while it "may require reference to the [parties' collective bargaining agreement ('CMA')] solely for factual information, ... [did] not require an interpretation of that agreement." (Docket No. 21 at 6.)

Following Judge Freedman's order, the parties consented to trial by this court and engaged in discovery. In due course, on November 30, 2001, Defendant filed the instant motion for summary judgment with respect to the remaining chapter 151B claim.[1] Plaintiff filed her opposition on January 2, 2002, and the court thereafter heard oral argument.

### III. *STANDARD OF REVIEW*

A court may grant summary judgment pursuant to FED.R.CIV.P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when

---

1. Defendant also moved to strike portions of Plaintiff's affidavit submitted as part of her opposition to Defendant's motion. By margin notation, the court has today denied Defendant's motion to strike as moot.

a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.'" *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir.1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

## IV. DISCUSSION

As applicable here, chapter 151B makes it unlawful "[f]or any employer ... to dismiss from employment ... or otherwise discriminate against, because of [her] handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation." Mass.Gen.L. ch. 151B, § 4(16). A "qualified handicapped person" is defined as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to [her] handicap." *Id.*, § 1(16). In essence, Defendant argues that Plaintiff is not a "qualified handicapped person" for two reasons: (1) she is admittedly unable to return to her prior SEO job; and (2) chapter 151B does not require Defendant, as a "reasonable accommodation," to reassign Plaintiff to a less-strenuous, vacant position. The court will address each contention in turn.

## A. PLAINTIFF'S ALLEGED ADMISSIONS WITH RESPECT TO HER SEO POSITION

Defendant's initial argument centers on Plaintiff's alleged "admissions" in both the SSDI and DIA proceedings that she was unable to continue working as an SEO. Those admissions, Defendant asserts, have not been sufficiently explained. Ergo, Defendant argues, Plaintiff is unable to show that she is a "qualified handicapped person" with respect to her former SEO position and, as a result, summary judgment should enter in Defendant's favor.

Defendant's argument revolves around *Cleveland v. Policy Mgm't Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). There, the Supreme Court held that—while the mere existence of an SSDI claim does not necessarily bar a subsequent discrimination action—a court, "[w]hen faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, ... should require an explanation of any apparent inconsistency with the necessary elements of [a handicap discrimination] claim." *Id.*, 526 U.S. at 807, 119 S.Ct. 1597. "To defeat summary judgment," the Supreme Court added, the plaintiff's "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* Plaintiff, Defendant argues, has provided no such explanation.[2]

Plaintiff, in response, does not really dispute that she is unable to return to her prior position. In fact, as Plaintiff testified at a DIA hearing, she "couldn't do" her "heavy lifting" SEO job (Docket No. 35 ("Def.'s Exhibits, Vol. I"), Exhibit A at 61), and, as she stated in SSDI proceedings, she was "unable to work" (Def.'s Exhibits, Vol. II, Exhibit E–19 at 4). Also, as confirmed at oral argument, Plain-

---

**2.** Although *Cleveland* involved the ADA, the parties agree that its reasoning applies to chapter 151B handicap discrimination claims. Without deciding the issue, the court will assume that to be the case. *See Sullivan v. Raytheon Co.*, 262 F.3d 41, 47 (1st Cir. 2001) (discussing *Cleveland* in context of chapter 151B).

tiff variously acknowledged that she cannot lift more than five pounds with her left arm, work with her left arm above chest high or be exposed to temperatures below fifty-five degrees.[3]

Nonetheless, Plaintiff, does offer a *Cleveland* explanation for the inconsistencies between her "admissions" and her present claim that she is able to work. Among other things, Plaintiff states that she applied for SSDI benefits only because Defendant "ordered" her to do so in a letter dated September 12, 1995. (See Docket No. 41 ("Pl.'s Exhibits"), Exhibit F–5.)[4] It was during this mandated application process, Plaintiff explains, that she made many of the statements now deemed contradictory, statements which supported a claim for what she understood to be temporary, not permanent, disability. In response, Defendant characterizes the SSDI application requirement as a mere condition of Defendant's internal disability plan and asserts that Plaintiff ought not to have applied for SSDI if she were not totally disabled.

■ In the court's opinion, Plaintiff's explanation that Defendant required her to seek SSDI, standing alone, is insufficient under *Cleveland*. Defendant's September 12, 1995 letter, however, said more. It stated, not entirely correctly in the court's view, that "Social Security does not require that an individual be permanently disabled to be eligible for payments" and that, "[u]nder the law, if a disability has

existed five months, benefits may be payable." (*Id.*) This statement, the court believes, puts a cast on Plaintiff's alleged "admissions" sufficient to pass *Cleveland*. With the assistance of able counsel, Plaintiff explains that Defendant's September 12th letter led her to believe that SSDI and workers compensation benefits might be available if she were not "permanently" disabled. Were she provided a reasonable accommodation to this limited disability in the form of a reassignment to another position, Plaintiff avers, she would have been able to return to work.[5]

In the court's view, several of the "admissions" to which Defendant now points have a sense of non-permanent, partial disability. For example, Plaintiff testified at a DIA hearing that, while "she does not have the present physical ability to return to work ... at her former position[,]" "she was hoping to return to work ... if [Defendant] could find reasonable light duty employment within her limitations." (Def.'s Exhibits, Vol. II, Exhibit E–12 at 4.) Also, at least one examining doctor opined that Plaintiff, although "totally disabled for the type of work she used to do at the time of the injury[,] ... [is] capable of doing light work with restrictions." (*Id.*)

As a result, the court believes, at least for summary judgment purposes, that Defendant's "ordering" Plaintiff to seek SSDI benefits, while something of an overstatement, provides an explanation sufficient to

---

**3.** To be sure, Plaintiff may have once told Defendant that she was willing to work without her medically-required arm brace and discontinue taking her medication. But, the court believes that neither of those proposals were reasonable accommodation requests.

**4.** As Plaintiff notes, the letter outlined requirements of Defendant's internal disability plan under which she was then receiving benefits. If Plaintiff's internal benefits were to continue, the letter stated, there were several

things which "must be done" by her, one of which was to apply for SSDI benefits. (See *id.*)

**5.** Plaintiff also contends that she ultimately received restorative surgery for her work injuries in April of 2000. The court, however, does not see how Plaintiff's later surgery bears on her termination in December of 1998 and, therefore, dismisses that explanation out of hand.

overcome Defendant's initial argument. Stated another way, a reasonable jury could conceivably determine (1) that Plaintiff felt compelled to apply for administrative benefits with respect to an injury she believed was "non-permanent" and (2) that the reason Plaintiff viewed her injury as non-permanent was because she thought she could perform a reassigned job.

Still, Plaintiff's explanation, as so credited, does not end the court's inquiry. For Plaintiff to overcome Defendant's motion, the court must determine as a matter of law that "reassignment" to a vacant position is required as a "reasonable accommodation" under Mass.Gen.L. ch. 151B § 4(16). The court thus turns to that issue.

## B. REASSSIGNMENT

■ Defendant argues that § 4(16) does not require it to consider, as a reasonable accommodation, reassigning to vacant positions employees, such as Plaintiff, who are unable to perform the essential functions of their past jobs. To be sure, the ADA, as both parties agree, specifically declares that "reasonable accommodation" "may in-

clude ... reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). But Plaintiff makes no claim under the ADA.[6] Her sole remaining claim arises under chapter 151B which, Defendant notes, does not mention reassignment. This difference, further explained below, has led at least one court to conclude that no such duty exists under the Massachusetts statute. *See Hayward v. Mass. Water Resources Auth.*, 2001 WL 635952, at *6 (Mass.Super. May 15, 2001). Having closely examined the complex legislative history surrounding the issue, this court agrees with that conclusion.[7]

Chapter 151B was amended in 1983 to include § 4(16)'s prohibition against handicap discrimination. *See* St.1983, c. 533, § 6. The amendment was patterned after the federal Rehabilitation Act of 1977 ("the Rehab Act"), 29 U.S.C. § 701 et seq. *See Cox v. New Eng. Tel. & Tel. Co.*, 414 Mass. 375, 607 N.E.2d 1035, 1039 (1993); SCOTT C. MORIEARTY, ET AL., 45 MASS. PRAC. EMPLOYMENT LAW § 8.13 and n. 4 (2001) (citing *Minicucci v. Charles Hotel*, 9 Mass.Discrim.L.Rptr. 1217, 1219 (1987)). The Rehab Act requires federal employers to

---

**6.** Nor has Plaintiff pursued a claim under the Massachusetts constitution which, in 1980, three years before § 4(16) was added to chapter 151B, was amended to bar discrimination against handicapped individuals "under any program or activity within the Commonwealth." *See* Article 114 of the Amendments to the Massachusetts Constitution. Whether Plaintiff would have had a direct cause of action under the amended constitution is uncertain, the courts, for the most part, having preferred to look to state statutes when confronted with handicap discrimination claims. *See, e.g., Tate v. Dep't of Mental Health*, 419 Mass. 356, 645 N.E.2d 1159, 1165 (1995) (upholding dismissal of article 114 count since "[c]laims of employment discrimination can be vindicated under the general antidiscrimination statute, G.L. c. 151B"); *Layne v. Sup't of MCI–Cedar Junction*, 406 Mass. 156, 546 N.E.2d 166, 168 (1989) ("If a violation of art. 114 rights can be redressed within the

ambit of an existing statute, ... there is a well-worn procedural path to relief for such a violation."); *but see Daigle v. Alexander*, 1993 WL 818723, at *6–7 (Mass.Super. Nov. 5, 1993) (allowing article 114 claim to proceed where plaintiff worked for small employer outside chapter 151B's scope).

**7.** Defendant makes two alternative arguments: (1) that, even under ADA standards, Plaintiff cannot establish an unlawful refusal to reassign; and (2) that, in any event, Plaintiff's claim is preempted by section 301 of the LMRA as it would require an interpretation of the parties' CBA. Because the court believes that chapter 151B, as presently written, does not provide Plaintiff the right to seek the kind of accommodation she pursues, it will not address these two alternative arguments, even though the first, at least, appears to have significant merit.

make "affirmative efforts to overcome the disabilities caused by handicaps," *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), but, when first enacted, did not generally require as a "reasonable accommodation" the reassignment of employees no longer capable of performing the essential functions of their jobs, *Fedro v. Reno*, 21 F.3d 1391, 1395 (7th Cir.1994). The Supreme Court noted this limitation in *School Board of Nassau County, Fla. v. Arline*, 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (observing that, while a Rehab Act employer "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies," it is "not required to find another job for an employee who is not qualified for the job he or she was doing"), as did the First Circuit in *Shea v. Tisch*, 870 F.2d 786, 789–90 (1st Cir.1989) (adopting Fourth Circuit's conclusion in *Carter v. Tisch*, 822 F.2d 465 (4th Cir.1987), "that an employer is not required to find alternative employment unless he normally does so under his existing policies").[8]

Notwithstanding Chapter 151B's link to the Rehab Act, Plaintiff argues that, in interpreting the Massachusetts statute, the court should look to the *ADA* for guidance. *See August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 n. 3 (1st Cir.1992) (noting that, "[i]n interpreting Massachusetts discrimination statutes, Massachusetts courts may look to the interpretation of analogous

federal statutes, but are not bound thereby"). Plaintiff's argument is not without merit.[9] In the case at bar, however, the ADA diverges from chapter 151B in a fundamental way and, therefore, in the court's view, provides Plaintiff little help as a statutory analogue. Before describing that divergence, however, it is necessary to provide further background.

The ADA was adopted in 1990, seven years after the addition of § 4(16) to chapter 151B. Although some of the ADA's language mirrors the Rehab Act, Congress acknowledged when passing the ADA that existing antidiscrimination laws were inadequately protecting the rights of the disabled. *See* H.R.Rep. No. 101–485, at 29, 32 (1990); S.Rep. No. 101–116, at 18–20 (1989). Thus, while similar to the Rehab Act in many ways, the two statutes intentionally differed, at least initially, in several significant respects.

For one thing, the ADA's definition of a "qualified individual with a disability" was different than that initially provided by the Rehab Act. The ADA defines the term as an "individual with a disability who, with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires." 42 U.S. § 12111(8). In contrast, the Rehab Act initially made no mention of accommodations and its implementing regulations defined "qualified" only in the context of the position in question. *See* 29 C.F.R. § 1613.702(f) (1992).

---

**8.** *See also Gile v. United Airlines, Inc.*, 95 F.3d 492, 496–97 (7th Cir.1996) ("Until recently, the Rehabilitation Act and its regulations did not include reassignment to a vacant position within the list of potential reasonable accommodations."); *Shiring v. Runyon*, 90 F.3d 827, 831–32 (3rd Cir.1996) (similar).

**9.** In *Dichner v. Liberty Travel*, 141 F.3d 24 (1st Cir.1998), for example, the First Circuit recognized that both chapter 151B and the ADA authorize a plaintiff to seek punitive damages,

but that the Massachusetts statute, unlike the ADA, "does not specify the types of situations in which such damages are appropriate." *Id.* at 33. Although "courts cannot automatically assume that punitive damages are available under Chapter 151B on the same basis as they are available to a plaintiff in a federal discrimination case," the First Circuit noted, it upheld District Judge Richard G. Stearn's application of the ADA's expanded language to a chapter 151B claim since neither side objected to such an approach. *See id.*

Thus, the ADA eliminated the Rehab Act's inference that only an employee's current job could be considered in the "reasonable accommodation" calculus. *See* Arlene Mayerson, *Title I—Employment Provisions of the Americans With Disabilities Act,* 64 Temp.L.Rev. 499, 515 (1991).

More importantly for purposes here, the ADA included "reassignment" in the list of possible accommodations. *See* 42 U.S.C. § 12111(9)(B). The absence of that term in the Rehab Act led a number of courts to conclude, regulatory language to the contrary, that reassignment, though perhaps permitted, was not required. *See, e.g., Carter,* 822 F.2d at 467; *Fields v. Lyng,* 705 F.Supp. 1134, 1137 (D.Md.1988), *aff'd,* 888 F.2d 1385 (4th Cir.1989). In the studied opinion of at least one commentator, this component of the ADA erased at least one element of Rehab Act unfairness, namely, that it allowed disabled federal workers to be terminated from jobs they could no longer do even though there were vacant positions for which they were qualified and able to perform. *See* Jeffrey S. Berenholz, *The Development of Reassignment to a Vacant Position in the Americans with Disabilities Act,* 15 Hofstra Lab. & Employment L.J. 635, 636 (1998). Many courts have since recognized that the ADA's use of the word "reassignment" did indeed expand the Rehab Act's obligation to accommodate. *See Eckles v. Consolidated Rail Corp.,* 94 F.3d 1041, 1048 (7th Cir.1996); *Shiring,* 90 F.3d at 831; *Emrick v. Libbey–Owens–Ford Co.,* 875 F.Supp. 393, 395–96 (E.D.Tex.1995); *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1104 (S.D.Ga.1995).

Regardless, in 1992, two years after the ADA's enactment, Congress amended the Rehab Act to incorporate the ADA standards, including the ADA's reference in 42 U.S.C. § 12111(9)(B) to reassignment as a potential accommodation. *See* 29 U.S.C. §§ 791(g), 794(d); *McLean v. Runyon,* 222 F.3d 1150, 1153 (9th Cir.2000). Thereafter, in October of 1992, the regulations were amended to reflect this change. *See* 29 C.F.R. § 1614.203 (2001). As a result, the substantive standards for handicap discrimination are now deemed the same whether suit is filed under the Rehab Act against a federally-funded entity or under the ADA against a private employer. *See Myers v. Hose,* 50 F.3d 278, 281 (4th Cir. 1995).

In significant contrast, Massachusetts, post-ADA, has made no statutory or regulatory change vis a vis reassignment. Like the original version of the Rehab Act, chapter 151B still defines a "qualified handicapped person" simply as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Mass.Gen.L. ch. 151B, § 1(16). And the state regulations with respect to accommodation also fail to specifically mention reassignment. *See* 804 C.M.R. § 5(c) and (e). *See also* 804 C.M.R. § 3.01(5)(b) (defining "qualified handicapped person" as "a handicapped person who is capable of performing the essential functions of the position with or without reasonable accommodation"). Thus, the court must conclude that § 4(16) is analogous, if at all, only to the original version of the Rehab Act which did not discuss reassignment. *See Hayward,* 2001 WL 635952, at *6 (observing that since the ADA's reassignment language does not exist in chapter 151 B, "no duty derived from this statutory language exists under Massachusetts law").[10]

10. While the First Circuit recently described § 4 of chapter 151B as "track[ing] the ADA in virtually all respects," *Gillen v. Fallon Ambu-* *lance Service, Inc.,* 283 F.3d 11, 21 n. 5 (1st Cir.2002), that case does not address the issue of reassignment.

The court addresses four remaining points. First, as indicated, judicial interpretations of the original version of the Rehab Act had a wrinkle; federal employers might have been required to find alternative employment for injured workers if they normally did so "under [their] existing policies." *Arline*, 480 U.S. at 289 n. 19, 107 S.Ct. 1123; *Shea*, 870 F.2d at 789–90. Here, however, Plaintiff does not argue that Defendant had an existing "policy" to reassign injured employees to different jobs.[11] Moreover, as District Judge William G. Young observed, courts have interpreted this duty narrowly: "while employers are under no obligation to let handicapped employees switch jobs, they must allow employees to transfer locations or work sites within the same job category." *Hurley–Bardige v. Brown,* 900 F.Supp. 567, 571 (D.Mass.1995) (citing cases). Here, Plaintiff offers no evidence that she could have performed her SEO job at a different "location" or "work site."

Second, this court might have been inclined to interpret § 4(16) more expansively if intervening case law had not made clear that, with a certain limited exception not applicable here, the original version of the Rehab Act did not include reassignment as a possible accommodation. To the extent that § 4(16) is deemed analogous to the original version of the Rehab Act, Plaintiff must take the interpretation of that act, negative as it may be to her interests, as readily as an interpretation in her favor. *See Cox,* 607 N.E.2d at 1043–44 (noting that courts look to the treatment of handicap discrimination under the Rehab Act since "there is no reason to construe

the Commonwealth's law differently" than its federal counterpart); *Mullin v. Raytheon Co.,* 164 F.3d 696, 705 (1st Cir.1999) ("*Cox* ... shows that, when confronted with employment discrimination claims of novel impression, the [Massachusetts Supreme Judicial Court] tends to rely on federal court interpretations of analogous federal statutes."). *See also Vasys v. Metro. Dist. Comm'n,* 387 Mass. 51, 438 N.E.2d 836, 839 (1982) ("When the Legislature, in enacting a statute, adopts the language of a federal statute, we will ordinarily construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts. We do not follow Federal precedent, however, when the Federal result is dictated by some principle of Federal law not found in the law of Massachusetts.").

Third, Plaintiff's wishes to the contrary, chapter 151B was not so elastic as to morph into the exact equivalent of the ADA when it came into being in 1990—or, indeed, into the Rehab Act when it was amended in 1992—so as to provide for reassignment as a required accommodation. Something more, e.g., a legislative amendment, was needed. *See Estate of Walton v. State Dep't of Revenue,* 579 So.2d 643, 644 (Ala.Civ.App.1991) (noting that "[a]n amendment of a federal statute does not amend a similar state statute without action of the state legislature"); *Hayward,* 2001 WL 635952, *6 (holding that to impose a reassignment obligation in chapter 151B would "open[ ] a Pandora's box of difficult issues regarding the interpretation and application of this obligation

---

**11.** The fact that, in the past, Defendant may have voluntarily transferred one or two other disabled workers is of no moment. As the First Circuit has observed, courts should not punish employers for doing more than is legally required with respect to handicapped employees since doing so "might discourage such an undertaking on the part of [other] employers." *Phelps v. Optima Health, Inc.,* 251 F.3d 21, 26 (1st Cir.2001) (citing cases). *See also Griffin v. Defense Mapping Agency,* 864 F.2d 1579, 1580–81 (Fed.Cir.1989) (noting that *Arline* applied only if there was "an 'existing policy,' manifested by regulation, to transfer" workers).

by employers" and that "[i]t should be the choice of the legislature, not of a court, as to whether to open this box").

Finally, while Massachusetts, at times, provides antidiscrimination protections greater than those provided federally, *see, e.g., Lyons v. Port Norfolk Yacht Club, Inc.,* 1989 WL 8817, at *4 n. 10 (D.Mass. Jan.25, 1989) (Mazzone, J.) (citing *Concord Rod & Gun Club, Inc. v. Mass. Comm'n Against Discrimination,* 402 Mass. 716, 524 N.E.2d 1364 (1988)), in this particular (perhaps narrow) statutory instance, the protections are fewer. Unfortunately for Plaintiff, therefore, Massachusetts appears to be aligned with a majority of other states. *See* U.S. Law Week, Vol. 70, No. 30 at 2486 (Feb. 12, 2002) ("[T]he research shows ADA comparable relief in only 35 of the 51 states.").

In sum, the court has no choice but to acknowledge, as Defendant argues, that state law does not create a reassignment obligation on the part of an employer and the court is reluctant to create such a duty out of whole cloth. As applied to the specific facts of this case, Mass.Gen.L. ch. 151 B, § 4(16) did not require Defendant to consider reassigning Plaintiff as a reasonable accommodation. Accordingly, the court will allow Defendant's motion for summary judgment.

## V. CONCLUSION

For the reasons stated, the court ALLOWS Defendant's motion for summary judgment. The clerk shall enter judgment for Defendant.

IT IS SO ORDERED.